**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

CONCERT INVESTOR, LLC,

        *Plaintiff,*

    v.

SMALL BUSINESS ADMINISTRATION,
et al.,

        *Defendants*.

Civil Action No. 1:21-cv-03150 (CJN)

**<u>MEMORANDUM OPINION</u>**

This is an action for review of a final decision of the Small Business Administration denying Shuttered Venue Operators Grant assistance to Concert Investor, a small business in the music industry. Concert Investor asserts that it is eligible for a grant because it "produces" concerts. The agency disagrees, concluding that Concert Investor merely provides services to other entities that produce concerts and is therefore ineligible. Both parties have moved for summary judgment. Pl.'s Mot., ECF No. 39; Def.'s Cross Mot., ECF No. 46. For the reasons set forth below, the Court will deny Concert Investor's motion, grant Defendants' cross-motion, and enter judgment in Defendants' favor.

**Background**

As part of a coronavirus relief package, Congress established the Shuttered Venue Operators Grant (SVOG) Program through the Economic Aid to Hard-Hit Small Business, Nonprofits, and Venues Act. Pub. L. No. 116-260, § 324, 134 Stat. 1182, 2022 (2020) (codified at 15 U.S.C. § 9009a). The SVOG Program authorizes financial assistance to eligible persons or entities that (1) were fully operational on February 29, 2020, and (2) had at least 25% less gross

earned revenue in any quarter in 2020 than it had in the same quarter a year earlier.  15 U.S.C. § 9009a(a)(1)(A)(i).  Entities eligible for SVOG funds include a "live performing arts organization operator," which is an entity that "as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists," and also meets other criteria not relevant here.  15 U.S.C. §§ 9009a(a)(1)(A), 9009a(a)(3)(A)(i)(I).

Concert Investor applied for a nearly $5 million grant in April 2021.  AR1–2.  Its initial application described itself as a "Theatrical producer."  AR1.  The SBA denied the application and Concert Investor appealed, this time describing itself as a "Live Performing Arts Organization Operator."  AR46–47.  It asserted that it "creates an artist-approved concert design before [it] source[s] and hire[s] the vendors, engineers, electricians, programmers and technicians for [] each of [its] productions or tours," and has "built the initial touring concert productions and technical staff" for various artists.  AR658–59.  And Concert Investor emphasized its "development of strategic long-term partnerships with industry professionals that included audio, lighting, video and special effects vendors and technicians." AR659.

The SBA denied Concert Investor's appeal, concluding Concert Investor's principal business activity was inconsistent with the selected entity type in the application.  AR23.

Concert Investor filed this suit in December 2021, challenging as arbitrary and capricious the agency's denial of its application.  Compl., ECF No. 1. The agency then rescinded its denial and reconsidered the application.  Def.'s Mot. to Stay, ECF No. 12.

In the action now challenged by Concert Investor, the SBA again denied the application. SBA Denial Letter (Mar. 23, 2022), ECF No. 39-1.  The agency explained that Concert Investor had not demonstrated that it is a "live performing arts organization operator." *Id.* at 1.  Although

Concert Investor asserted it fit within the statutory definition because it was a "producer" of concerts, the agency concluded that the record demonstrated Concert Investor is "a service provider for lighting and sound," not a producer of entire concerts. *Id.* at 3. The opinion did not expressly provide a definition of "producer," but suggested that producers must have principal business activities broader than providing full-service lighting and sound. *Id.* The opinion quoted the SBA's Frequently Asked Questions on the SVOG program, which state that "service and support companies" including those that "provide stages, lighting, sound, casts, and other support" are not eligible for SVOG grants. *Id.* at 3–4.

The agency also explained that, while Concert Investor had identified seven similar entities that received SVOG funds, four provided client services that Concert Investor did not provide; as to the other three grants, the agency stated that it was reexamining them and would rescind them if they were improperly made. *Id.* at 4–5. The SBA has since completed its revaluation and rescinded those three awards. Notice, ECF No. 60.

Concert Investor moves for summary judgment, arguing, *inter alia*, that the SBA's denial was arbitrary and capricious because the agency failed to consider relevant evidence and it treated Concert Investor differently than similarly situated competitors. Pl.'s Mot., ECF No. 39. The government also moves for summary judgment, arguing its decision was reasonable and lawful in all respects. Def.'s Cross Mot., ECF No. 46. The Court heard argument on the cross-motions on June 21, 2022.

## Legal Standards

Summary judgment is warranted "when there is no genuine dispute as to any material fact and [] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases challenging agency action under the APA, the district court "sits as an appellate tribunal," and

review "is based on the agency record and limited to determining whether the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009) (quotation marks omitted) (citing 5 U.S.C. § 706).

Under the APA, a court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). So long an agency "articulate[s] a satisfactory explanation for its action including a rational connection between the facts found and the choice made," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted), a court may not "substitute [its] judgment for the agency's," even if it "might have reached a different conclusion in the first place." *Epsilon Elecs., Inc. v. Dep't of Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," taking into account "whatever in the record fairly detracts from its weight." *AT&T Corp. v. FCC*, 86 F.3d 242, 247 (D.C. Cir. 1996) (quotations omitted).

## Analysis

## I.    The SBA's Definition of "Produces" Is Not a *Post Hoc* Rationalization.

The parties base most of their arguments on competing understandings of what entities are eligible for the SVOG Program. Under the statutory provisions relevant here, an entity is eligible if it is a "live venue operator or promoter, theatrical producer, or live performing arts organization operator." 15 U.S.C. § 9009a(a)(1)(A). The statute further defines this subset of eligible entities:

> The term "live venue operator or promoter, theatrical producer, or live performing arts organization operator"—
>    (A) means—
>        (i) an individual or entity—
>            (I) that, as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists . . .

15 U.S.C. § 9009a(a)(3).

Much of the argument in the briefs concerns what it means to be an entity that "produces . . . live concerts." *Id.* at § 9009a(a)(3)(A)(i)(I).  The government relies on several dictionaries and contends that a company only "produces" a concert, within the meaning of the statute, if it is "ultimately responsible for essentially all aspects of putting a concert together."  Def.'s Mot. at 5. The government further suggests that the SBA's denial of Concert Investor's application applied this definition, even though the opinion does not expressly state such a definition, and even though the SBA had not previously offered such a definition.[1]  The government also argues that *Skidmore* deference is appropriate because the question involve issues within the SBA's area of expertise. Hearing of June 21, 2022.  *Skidmore v. Swift*, 323 U.S. 134, 139–140 (1944).

Concert Investor does not clearly present an alternative definition of "produces . . . live concerts."  It seems to argue that the industry's use of the terms "produce" and "production" is flexible.  Hearing of June 21, 2022; *see also Concert/Event Producer*, Berklee Coll. of Music, https://www.berklee.edu/careers/roles/concertevent-producer.  And Concert Investor references articles in industry magazines, statements by people in the industry, and various contracts to show that Concert Investor is often called a "producer" and is responsible for what some call the "production" elements of live performances.  But Concert Investor's primary opposition to the

---

[1] The denial did reference the definition of "Theatrical producer" included in the SBA's Frequently Asked Questions page for the program, which defines "theatrical producer" as:

> [A]n eligible individual or entity (including the entity that employs the performers in a theatrical production) which has the responsibility for creating, producing, or operating live theatrical productions and that have either a non-passive profit (net income or loss) interest in a theatrical production (other than as a vendor or service provider) or sole or joint rights to control a theatrical production.  Theatrical producers are responsible for functions such as negotiating debt or equity financing with lendors [sic] or investors, financial and tax reporting, and closing the production . . .

SBA Denial Letter at 3, n.2.

definition offered by the SBA here is that the agency did not define "producer" in the opinion below, so the definition presented here is an impermissible *post hoc* rationalization.

The appropriate definition of "produces" is not a simple interpretive question, but the Court ultimately agrees with the government. It is clear that some in the industry use the word flexibly, including many who apply it to entities like Concert Investor. But the government persuasively argues that the ordinary meaning of the term has more substance, connoting ultimate control over all aspects of a show. *See* Defs.' Mot at 5–6, *see also Oxford's English Dictionary*, https://www.oed.com/view/Entry/151978 ("To bring (a performance) before the public; to administer the staging of (a play, opera, etc.) or the financial and managerial aspects of (a film, broadcast, etc.); to supervise the making of (a musical recording), esp. by determining the overall sound."); *Am. Heritage Dictionary of the English Language* (5th ed. 2022) (a producer "supervises and controls the administrative, financial, and commercial aspects of staging a show or performance or of creating and distributing a video or audio recording"); *Merriam-Webster's Dictionary*, https://www.merriam-webster.com/dictionary/producer ("supervises or finances a work (such as a staged or recorded performance) for exhibition or dissemination to the public"). And while some use "producer" flexibly, the more comprehensive definition of "producer" appears to be the industry standard. *See Concert/Event Producer*, Berklee Coll. of Music, https://www.berklee.edu/careers/roles/concertevent-producer (defining the role of a producer as "[p]art event planner, part operations coordinator, and part technical director" who is "charged with guiding live events from ideation to completion . . . from booking artists and hiring staff to preparing the venue and furnishing it with equipment," and emphasizing the position's "holistic and multifaceted nature").

And this definition is not a *post hoc* justification, but is strongly implied throughout the denial. The SBA's decision implicitly dismisses the flexible definition of "producer" in concluding that Concert Investor is not a producer because its activities are limited to providing lighting and sound.

SBA Denial Ltr. at 3–5.  Furthermore, the denial also expressly rejected the argument that Concert Investor is a "theatrical producer," which (as the denial put it) is "responsible for functions such as negotiating debt or equity financing with lendors [sic] or investors, financial and tax reporting, and closing the production."  *Id.*  The SBA's use of this definition in the theatrical context suggests the term would carry similarly broad responsibilities in the live concert context.  And while the agency did not directly articulate this reasoning, the text of the statute itself implies that there are few producers—or even only one producer—for a given live arts performance.  It is a basic principle of interpretation that statutory definitions should not be read wholly untethered from their referent. The term that the phrase "*produces . . . live concerts*" partially defines is "live performing arts organization *operator*."  It would be odd to call anything less than the entity primarily responsible for a concert to be an *operator* of live performing arts events.  Thus, a plain reading of the statute implies the government's reading (or at least something very close to it).

Accordingly, the Court does not believe the government's clarification of the term "producer" in its briefs is a *Chenery* violation.  Rather, it is an "amplified articulation" of its definition of "producer" where the relevant portions of the definition were already present in the underlying opinion.  *Alpharma, Inv. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006); *Loc. 814, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976).  The SBA's decision makes clear that the agency was interpreting "producer" to require a broad set of responsibilities.  Notably, Concert Investor did not engage in a substantive critique of the SBA's definition or present a contrary definition of its own, except, perhaps, at argument.[2]

---

[2] Nor did Concert Investor argue that the best reading of the statute foreclosed the government's definition of producer such that *Chevron* deference, if it applied, would be insufficient to save the SBA's position.

II.    **Concert Investor Has Not Demonstrated That the SBA's Denial Was Arbitrary and Capricious.**

Agencies must engage in reasoned decision-making. *Allentown Mack Sales and Serv., Inc. v. NLRB*, 522 U.S. 359, 374–75 (1998); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 105 (1983). Agency action is arbitrary and capricious when, for example, the agency (i) relies on factors that Congress did not intend it to consider; (ii) fails to consider an important aspect of the problem; (iii) offers an explanation for its decision that runs counter to the evidence before the agency, or (iv) acts in a manner so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *State Farm*, 463 U.S. at 43. Likewise, agency action is arbitrary and capricious where the agency fails to "state its reasoning." *Select Specialty Hosp.– Bloomington, Inc. v. Burwell*, 757 F.3d 308, 312 (D.C. Cir. 2014).

A.    **The SBA Did Not Ignore Relevant Evidence of Concert Investor's Eligibility.**

Concert Investor argues that the agency's conclusion that the company's principal business activity is limited to providing lighting and sound completely ignored evidence that the company provides a wide range of services. Pl.'s Mot. at 11. Concert Investor contends that that evidence— a variety of sworn statements, internal business documents, and news-articles—supports its status as a concert producer and went completely unconsidered by the agency.

The government argues both that the SBA actually considered this evidence and that none of it runs contrary to the agency's conclusion. While the underlying opinion does not cite to each piece of evidence in the record, the government notes that the opinion asserts the SBA "examined the administrative record" and "determined Concert Investor's eligibility based on the information [that Concert Investor had] provided." SBA Denial Ltr. at 2, 5; *see also id.* at 1–3 (explaining the decision was made "after further review of the administrative record . . . [b]ased on" the "submissions provided"). In its briefs here, the government carefully analyzes each piece of

evidence that Concert Investor proffers and contends that none of the evidence runs contrary to what the agency calls the ordinary definition of a "producer"—the entity "ultimately responsible for essentially all aspects of putting together a concert." Defs.' Mot. at 5; *see id.* at 7–13. The government doubles down on the agency's conclusion that Concert Investor's principal business activity is limited to providing "lighting and sound" services—it is not a full service producer.[3]

In reply, Concert Investor cries foul. It again argues that the agency's responses are impermissible *post hoc* rationalizations. *See SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943); *NLRB v. CNN Am., Inc.,* 865 F.3d 740, 751 (D.C. Cir. 2017). And it reiterates that the evidence demonstrates it does more than lighting and sound.

In an informal adjudication, however, an agency need not cite or explain its reasoning as to every piece of evidence that could be read to run contrary to its determination. Unless another statute or regulation requires more, the APA requires the agency engage with as much evidence as necessary such that its logic can reasonably be discerned. *Bowman Transp. Inc. v. Arkansas-Best Freight System,* 419 U.S. 281, 286 (1974). To be sure, an agency must show it has considered the relevant aspects of the issue at hand and must demonstrate a rational connection between the facts found and the decision made. *State Farm*, 463 U.S. at 43. But the agency's reasoning need not be a model of analytical precision, nor must it include an exhaustive analysis of the record. *Cf. Home Box Off., Inc. v. FCC*, 567 F.2d 9, 36 n.58 (D.C. Cir. 1977) ("[C]omments which themselves

---

[3] Government counsel contends that the record is best read to suggest that Concert Investor is limited to creating only the *visual* elements of its clients' concerts with little to no responsibility for the sound. Defs.'s Mot. at 13. Regardless, the government must defend the agency's decision on the grounds the agency used in the underlying opinion, which here is that Concert Investor was responsible for lighting and at least some sound, and that is insufficient to constitute a "live performing arts organization operator."

. . . do not disclose the factual or policy basis on which they rest require no response.  There must be some basis for thinking a position taken in opposition to the agency is true.").[4]

Here, the arc of the agency's reasoning is readily discernible.  The reviewing official stated, "Based on [the application] and the other submissions provided, I conclude that Concert Investor, at best, serves the needs of touring concert artists for lighting and sound, designing the plots and obtaining subcontractors to install and operate the necessary equipment during a concert."  SBA Denial Ltr. at 3.  While the written opinion did not provide an analysis for every piece of evidence that could be interpreted to the contrary, the agency "examined the administrative record" and the opinion does analyze representative evidence, including a sample contract, invoices, and Concert Investor's various appeal letters.  *Id.* at 2–3, n.1.  The fairest reading of the opinion is that the SBA actually considered all of the record evidence, ultimately concluded Concert Investor is responsible for the light and sound aspects of musical tours and thus is not a producer, and provided a written analysis as to some (though not all) of the evidence it relied on to reach that conclusion.

Against this backdrop, Concert Investor's precise allegation comes into focus.   If the documents omitted from the opinion provide a significant reason to believe Concert Investor's principal business activities go well beyond providing lighting and sound services, the Court would likely conclude that the underlying opinion is arbitrary and capricious for failing to discuss or distinguish them.  But if the evidence is substantially duplicative of evidence considered on the

---

[4] This is particularly true where, as here, the agency is responsible for ramping up a program and making thousands of determinations in a short timeframe.  Since the law authorizing the program was passed at the end of 2020, the SBA has awarded over $14.46 billion to around 13,000 grantees out of over 17,500 applicants in the performance arts industry.  Stevens Decl. ¶¶ 6–7, 14.  It's simply unrealistic to require an exhaustive written evaluation as to each piece of evidence submitted in so many applications.

record or consistent with findings made in the underlying opinion, then the Court cannot rule that the SBA's failure to cite or explain its analysis of that evidence is arbitrary and capricious.

The Court has reviewed the evidence that Concert Investor asserts the agency overlooked and agrees with the government that none raises a significant new question as to whether Concert Investor is engaged in the activities of a producer. Rather, the evidence is, in relevant part, cumulative of evidence that was analyzed on the record or at least raises no significant new challenge to the agency's findings. *See* SBA Denial Ltr. To be sure, the evidence indicates Concert Investor had significant responsibilities—it contracted with vendors, was responsible for some designs, equipment, logistics, occasional transportation, and more—but the underlying opinion acknowledged many of those responsibilities, and, regardless, the responsibilities are wholly consistent with the agency's finding that Concert Investor has lighting and sound responsibilities but is not a producer.

For example, Concert Investor points to a notarized statement by one of its owners:

> Concert Investor creates an artist-approved concert design before we source and hire the vendors, engineers, electricians, programmers and technicians for … each of our productions or tours. Our company procures and maintains the Workers Compensation Insurance and General Liability Insurance for all the production elements and associated labor for each production or tour.

AR658. But this fails to raise a new aspect of Concert Investor's principal business. The denial letter explained that Concert Investor provides services for lighting and sound, including "obtaining subcontractors." SBA Denial Ltr. at 3. Obtaining insurance appears to be a specific activity of being a service provider and contractor, not significant evidence of a new business activity. And the letter's use of the word "productions" does not raise a new issue because, as noted, it was clear in the denial that there are multiple senses of the word "production" or "produce," and the agency plainly did not use the flexible definition. This statement's use of the

term in a manner inconsistent with the SBA's usage does not make it arbitrary for the agency not to distinguish it in the opinion.

Similarly, Concert Investor points to the statement in the letter from its CPA that "Concert Investor is solely engaged in the business of producing live concert events" and generally refers to Concert Investor as a producer. AR368. But a conclusory use of the word "producer" or "production" does not make this letter particularly material to whether Concert Investor's activities extend beyond being a service provider for lighting and sound, much less whether it is properly classified as a producer within the meaning of the statute. *Cf. Home Box Off., Inc.*, 567 F.2d at 36 n.58 ("[C]omments which themselves . . . do not disclose the factual or policy basis on which they rest require no response.).

The same is true for the magazine articles. Concert Investor points to two articles from *Lighting & Sound America* and *Production, Lights & Staging News* that use the term "producer" and "production" to describe Concert Investor. But the substance of the articles does not give rise to significant new questions about whether Concert Investor engages in business activities beyond being a general service provider lighting and sound. To be sure, the articles provide additional details about Concert Investor's business, including how it is responsible for "audio, lighting, LED, projection, cameras, automation, rigging, custom set pieces, special effects, lasers, cryo, pyro, confetti, as well as motion graphics, crewing, and shipping occasionally like air freighting the production between continents," as well as synchronizing such effects with the music. AR967, 950. But the agency's denial itself noted that Concert Investor "serves the needs of touring concert artists for lighting and sound, designing the plots and obtaining subcontractors to install and operate the necessary equipment during a concert." SBA Denial Ltr. at 3. Certainly, the denial contains a bland summary of Concert Investor's business whereas the articles give lively details,

Case 1:21-cv-03150-CJN    Document 73    Filed 07/25/22    Page 13 of 17

but the two descriptions are not substantively opposed. The articles themselves do not raise a significant new question as to the breadth of Concert Investor's business and so it was not unreasonable for the agency to omit citation or discussion of them.

For much the same reason, Concert Investor's references to various budget and planning documents are also unpersuasive. As an initial matter, the denial expressly notes the SBA *did* consider the invoices that Concert Investor provided but concluded that "[t]here is nothing in [those] documents which show that Concert Investor provided any services beyond those connected with light and sound." SBA Denial Ltr. at 3, n.1. Concert Investor notes that the documents show weekly budget items for audio, lighting, video, power, labor, rigging, special effects, and staffing payments. AR432–587. But this is wholly consistent with the agency's determination that Concert Investor is a service provider for lighting and sound. (To be sure, an important one that hires and manages sub-vendors, and assumes near or total responsibility for the lighting and sound, but still a service provider.). Concert Investor has pointed to nothing about these documents that displaces or seriously questions the SBA's conclusions that Concert Investor's principal business activity is limited to lighting and sound.

The Court concludes that the SBA's decision was not arbitrary and capricious for failing to cite or expressly analyze this evidence in its written opinion. The arc of the agency's reasoning is readily discernible. The evidence that Concert Investors alleges SBA overlooked does not give rise to any significant questions that were not already addressed on the record.

**B. The SBA's Conclusions Are Not Counter to the Evidence.**

Concert Investor argues that several of the SBA's conclusions are contrary to the evidence presented. Specifically, it argues that the evidence demonstrates Concert Investor's principal business activities include more than just being a light and sound service provider because it hires technicians, selects sub-vendors, manages tour equipment, production designs and more.

13

The government counters that all of those activities (and the evidence regarding them) are consistent with Concert Investor being a service provider for light and sound—an important service provider, but not a producer.

The Court agrees with the government for largely the same reasons discussed above. The evidence on which Concert Investor relies is not, in fact, inconsistent with the SBA's conclusions. Instead, applying the ordinary and industry definition of "produces . . . live concerts"—referring to the entity responsible for essentially all of a concert—the SBA's decision is consistent with the evidence to which Concert Investor points.

### C. Concert Investor Fails to Show Any Disparate Treatment By the SBA.

Concert Investor argues that the SBA acted arbitrarily by denying its application but granting the applications of seven competitors that it argues are similarly situated. Concert Investor argues that the differential treatment of three of those competitors went unexplained. And while the SBA contended that it may have made a mistake in granting those applications and was re-evaluating those three grants, Concert Investor argued that "mere uncertain plans" to rescind such mistakes are insufficient. *See* Mem. Op. at 10, n.2, *MomoCon, LLC v. SBA*, No. 1:21-cv-02386-RC (D.D.C. Feb. 10, 2022). As to the four other competitors, Concert Investor argues that the SBA provided deficient explanations for distinguishing them.

The government argues that it gave a legitimate justification for treating each company differently. It argues that as to the three competitors, those grants appear to have been simple mistakes, and an agency is not obligated to give other entities the benefit of the same mistake going forward. And as to the four others, the government argues that the SBA Denial Letter's explanations are sufficient.

The Court agrees with the government. Administrative agencies must treat similarly situated companies alike unless it can provide a justification for failing to do so. *Kreis v. Sec'y of Air*

*Force*, 406 F.3d 684, 687 (D.C. Cir. 2005); *Burlington N. & Santa Fe Ry. Co. v. Surface Transp. Bd.*, 403 F.3d 771, 776 (D.C. Cir. 2005); *Balt. Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 954 F.3d 279, 285 (D.C. Cir. 2020) ("[T]he duty to explain inconsistent treatment is incumbent on the agency . . . ."). And differential treatment of competitors is particularly salient. *ANR Storage Co. v. FERC*, 904 F.3d 1020, 1026 (D.C. Cir. 2018).

Regarding the three similar entities, the SBA asserted that it was "reevaluating and reconsidering the eligibility of the [three] competitors." SBA Denial Ltr. at 5. It further asserted that it would rescind the grants if they were ineligible. *Id.* Government counsel has since advised the Court that such reconsideration is now complete, and the SBA has now determined that a mistake was made: the entities were not eligible for the program, and it is referring the entities to a program for recouping improperly awarded funds. *See* Notice, ECF No. 60. The agency need not do more.

There is some language in an opinion from another court in this District that suggests that actual "[r]escission of funds granted to . . . competitors" would moot a disparate treatment claim, whereas "uncertain plans to do so in the future do not." Mem. Op. at 10, n.2, *MomoCon, LLC v. SBA*, No. 1:21-cv-02386-RC (D.D.C. Feb. 10, 2022). In this case, the SBA is well beyond "uncertain plans"—it has already concluded that rescission is appropriate and has referred the three similar companies to a program to recoup the improperly awarded funds. *See* Notice, ECF No. 60. And in any event, it is well-established that an agency's recognition that an honest mistake was previously made can itself be a legitimate justification for differential treatment. *Chem-Haulers, Inc. v. Interstate Com. Comm'n*, 565 F.2d 728, 730 (D.C. Cir. 1977) ("The mere fact that the [agency] may have nodded on one occasion does not entitle a litigant to a repetition of its blunder."); *Tex. Int'l Airlines v. Civ. Aeronautics Bd.*, 458 F.2d 782, 785 (D.C. Cir. 1971) ("Assuming that the Government made a mistake as to [another entity] in the application of the [program], the law does not require the

Government to perpetuate the mistake").  That is particularly true where, as here, a program includes

tens of thousands of applications to be decided over a short period of time.

As to the other four entities, the SBA provided reasonable explanations for treating them

differently.  With respect to Blackbird Productions, while Concert Investor is correct that the SBA

found both companies do many of the same types of tasks, the SBA determined that Blackbird

undertakes those activities across all aspects of a concert—not just for visual and sound elements.  SBA

Denial Ltr. at 5.  For the same reasons, the SBA's distinction that Activated Events is involved in "all

aspects" of festivals is also reasonable.  SBA Denial Ltr. at 4.

In addition, the denial distinguished Beaver Productions, Inc., because it is both a producer and

a promoter.  Concert Investor has not demonstrated that the SBA's grant to Beaver Productions, Inc.

turned on its being a producer, so it is not clear it is similarly situated at all.  *See UnitedHealthcare*

*Ins. Co. v. Becerra*, 16 F.4th 867, 882 (D.C. Cir. 2021) ("The party challenging agency action

bears the burden of proof.").

Finally, the denial distinguished Matt Davenport Productions by noting it applied as a

"theatrical producer" rather than, as Concert Investor did, "Live Performing Arts Organization

Operator."  *Id.* at 4.  But the SBA primarily relies on the distinction in activities—Matt Davenport

Productions is involved in providing "original content, music composition and arrangement, creative

development, costuming, directing, choreography, project management" and other services as well as

lighting and sound services.  SBA Denial Ltr. at 4–5.  Concert Investor argues that those other services

are not essential to being a producer.  That is true even under the SBA's definition, but the SBA

concluded the much greater breadth of Matt Davenport Productions' services pushed it over the line

into being a producer—or (as the SBA would, at least now, put it) into being responsible for essentially

all aspects of event.  The Court cannot conclude the agency was unreasonable in making that judgment call.[5]

## Conclusion

For the foregoing reasons, the Court will deny the plaintiff's motion and grant the agency's motion.  An order will be issued contemporaneously with this opinion.

DATE:  July 25, 2022

CARL J. NICHOLS
United States District Judge

---

[5] In its opening brief, Concert Investor argued that the SBA's denial was unsupported by substantial evidence and it was otherwise contrary to law.  Concert Investor appears to have abandoned such arguments in its reply.  Regardless, both arguments fail.

Concert Investor initially argued that the SBA's denial is unsupported by substantial evidence. Pl.'s Mot. at 19–20.  The APA provides for no such additional review for informal adjudications. *See* 5 U.S.C. § 706(2)(E) (providing for "substantial evidence" review for *formal* proceedings and when "hearings" are otherwise required by statute).  To the extent substantial evidence review is appropriate (perhaps as a component of whether the denial is arbitrary and capricious), the standard is clearly met.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. Columbian Enameling & Stamping Co.,* 306 U.S. 292, 300 (1939) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)). Here, the agency relied on the documents Concert Investor submitted in its appeal, including, for example its draft contract with Twenty-øne piløts.  Under the contract, Concert Investor would provide equipment and some equipment-related services to Twenty-øne piløts, but it was Twenty-øne piløts that was responsible for logistics around transportation.  These documents alone (and especially when combined with other evidence the agency considered) are sufficient to convince a reasonable mind that Concert Investor is not primarily responsible for the production of live performances.

Similarly, Concert Investor briefly made the argument that the agency's denial is contrary to law. But even if it hadn't been abandoned, that argument is incorrect for the reasons stated in §§ I & II—in short, Concert Investor has not shown that the SBA was unreasonable in concluding it is not an eligible entity.