UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CONCERT INVESTOR, LLC,

     *Plaintiff*,

     v.

SMALL BUSINESS ADMINISTRATION,
*et al.*,

     *Defendants*.

Civil Action No. 1:21-cv-03150 (CJN)

## MEMORANDUM OPINION

Several years ago, Concert Investor applied for and was denied an award from the Shuttered Venue Operators Grant (SVOG) program, a coronavirus relief program designed to provide financial assistance to performing arts businesses. After litigation here and a post-appeal remand to the Small Business Administration, Concert Investor argues that the agency's most recent denial of its application is unlawful. The government defends that denial but also argues that the Court lacks subject-matter jurisdiction. For the reasons that follow, the Court concludes that it has jurisdiction, vacates the SBA's denial of Concert Investor's application, and remands to the agency for further proceedings consistent with this opinion.

### I.    Background

To provide assistance to performing arts businesses that suffered financial losses during the COVID-19 pandemic, Congress established the SVOG program through the Economic Aid to Hard-Hit Small Business, Nonprofits, and Venues Act. Pub. L. No. 116-260, § 324, 134 Stat. 1182, 2022 (2020) (codified at 15 U.S.C. § 9009a). A "live performing arts organization operator"—that is, an entity that, "as a principal business activity, organizes, promotes, produces,

1

manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists"—is eligible for SVOG funds if it meets several requirements.  15 U.S.C. §§ 9009a(a)(1)(A), 9009a(a)(3)(A)(i)(I).  Among other things, the entity must have been fully operational on February 29, 2020, and have experienced a decrease of at least 25 percent in gross earned revenue in any quarter in 2020 in comparison to the same quarter a year earlier.  *Id.* § 9009a(a)(1)(A)(i).

Concert Investor, a Tennessee-based company that describes itself as "specializ[ing] in the custom creation, design, management and production of live concert tours," ECF 109-2 at 3, applied for nearly $5 million under the SVOG program, AR1–2.  Its initial application identified itself as a "Theatrical producer."  AR1.  But after the SBA denied that application, Concert Investor shifted to contending in its administrative appeal that it was a "Live Performing Arts Organization Operator," AR46–47.  The SBA nonetheless rejected the appeal.  AR23.

Concert Investor thereafter filed this suit.  ECF 1.  The SBA then rescinded its denial and reconsidered Concert Investor's application.  AR1131.  After that review, the SBA once again concluded that Concert Investor was ineligible for relief.  *Id.*  In particular, the agency rejected Concert Investor's argument that it was a "producer," instead finding that it was a mere "service provider for lighting and sound."  AR1133.

After the parties briefed the merits, the Court denied summary judgment to Concert Investor and granted summary judgment to the government.  *Concert Inv., LLC v. SBA*, 616 F. Supp. 3d 25, 37 (D.D.C. 2022).  It concluded that the term "'produces' . . . connot[es] ultimate control over all aspects of a show," *id.* at 30–31, and that the SBA's application of this definition to deny Concert Investor's application was not arbitrary and capricious based on the evidence in the record, *id.* at 32–37.

Concert Investor appealed and the Court of Appeals vacated and remanded. *Concert Inv., LLC v. SBA*, 100 F.4th 215, 223 (D.C. Cir. 2024). It held that "[t]he SBA's reading of the Act is inconsistent with the statutory language" given that "[i]f an entity also had to organize, promote, manage, or host a concert in order to produce it, then any entity that met the definition of 'produces' would simultaneously meet another basis for eligibility—rendering 'produces' superfluous." *Id.* at 221–22. After considering evidence of "how the industry defines a producer," the Court explained that "[a]n appropriate definition must . . . capture the significant financial, creative, and managerial role that live event producers play from start to finish." *Id.* at 222. The Court of Appeals further noted that "[b]ecause the SBA defined 'produces' too narrowly, it also failed to consider relevant record evidence supporting Concert Investor's eligibility for a Grant." *Id.* at 222–23.

In response to that decision, the SBA *sua sponte* rescinded its prior denial, and after another round of review, once again denied Concert Investor's application. AR1119. Refining its earlier definition, the SBA determined that "to 'produce' a live event, an entity must demonstrate primary responsibility for the creative, financial and managerial work required throughout all stages of the live event." AR1121. It concluded that Concert Investor "has not demonstrated it has the primary responsibility for the creative, financial, and managerial aspects of the events on which it works required to be considered to 'produce' the events on which it works." *Id.* Instead, "[b]ased on the materials submitted, [the] SBA . . . consider[ed] Twenty-One Pilots," one of Concert Investor's primary clients, "to be the 'producer' of the concerts at issue in this matter." AR1124.

Concert Investor again moves for summary judgment. ECF 94. It asks the Court to "vacate the SBA's denial and enter an order directing the agency to approve Concert Investor's application and disburse the critical funding without further delay." *Id.* at 2. The government defends the

3

SBA's denial based on the "primary responsibility" definition of "produces," ECF 112, but also contends that the Court lacks subject-matter jurisdiction, ECF 116.

## II.    Jurisdiction

"At every stage in litigation, a federal court must determine that is has jurisdiction to hear the case before it." *Vogel v. Go Daddy Grp., Inc.*, 266 F. Supp. 3d 234, 237 (D.D.C. 2017); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). "Although sovereign immunity bars suits against the United States absent an express waiver, the APA supplies a general waiver for suits challenging final agency action." *Steele v. United States*, 144 F.4th 316, 322 (D.C. Cir. 2025) (citation omitted). In particular, the APA provides that "[a]n action in a court of the United States *seeking relief other than money damages* and stating a claim that an agency . . . acted or failed to act . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States." 5 U.S.C. § 702 (emphasis added). But this waiver does not "confer[] authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Id.*

The government argues that the APA's waiver of sovereign immunity does not apply here because Concert Investor seeks money damages and the Tucker Act impliedly forbids the requested relief. ECF 116-1 at 2–14. Concert Investor responds that this case implicates the APA's waiver of sovereign immunity because its primary requested relief (vacatur of the denial of its application) does not constitute money damages and its claims are not contractual in nature as required to implicate the Tucker Act. ECF 121 at 2–12.

**1.**    The government's first argument focuses on the APA's express reservation of sovereign immunity for lawsuits seeking "money damages." 5 U.S.C. § 702. The government

4

contends that what Concert Investor actually seeks, regardless of the prayer for relief's injunctive framing, is an order compelling the SBA to pay a specific sum of money—in other words, money damages. ECF 116-1 at 3–5. Precedent, however, counsels against a reading of "money damages" that would include almost any suit that could ultimately result in the plaintiff obtaining a monetary payout.

Most on point, the Supreme Court held in *Bowen v. Massachusetts* that the APA's waiver of sovereign immunity encompassed a suit challenging an agency's order denying a state reimbursement for certain Medicaid expenditures. 487 U.S. 879, 893 (1988). Emphasizing "the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief—which may include . . . 'the recovery of specific property *or monies . . . or* [an] injunction,'" the Court made clear that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* (quoting *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 688 (1949)). Because the plaintiff sought "funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [the plaintiff] will suffer or has suffered by virtue of the withholding of those funds," the Court concluded that the APA's waiver of sovereign immunity applied. *Id.* at 895 (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985)). Applying this distinction "between specific relief and compensatory, or substitute, relief," *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999), the Court of Appeals has accordingly held that "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages," *see,*

*e.g.*, *Am.'s Cmty. Bankers v. FDIC*, 200 F.3d 822, 829 (D.C. Cir. 2000); *Esch v. Yeutter*, 876 F.2d 976, 984 (D.C. Cir. 1989).

The government relies heavily on a single line from the Supreme Court's later decision in *Great-West Life & Annuity Inc. Co. v. Knudson*: "Almost invariably . . . suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' as that phrase has traditionally been applied, since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." 534 U.S. 204, 210 (2002) (quoting *Bowen*, 487 U.S. at 918–919 (Scalia, J., dissenting)). But *Knudson* did not displace the longstanding distinction between monetary compensation and specific relief for purposes of sovereign immunity under the APA. Indeed, the decision did not involve the APA's waiver of sovereign immunity at all, but instead concerned the entirely different question of whether an order imposing personal liability for a contractual obligation to pay money constituted "equitable relief" under the Employee Retirement Income Security Act.[1] *Id.* at 220–21; *see also* 29 U.S.C. § 1132(a)(3). In addition, almost all the Court's engagement with *Bowen* in *Knudson* came in the form of emphasizing the several differences between the cases. *See Knudson*, 534 U.S. at 212 ("*Bowen*, unlike petitioners' claim, did not deal with specific performance of a *contractual* obligation to pay *past* due sums."). Given that Concert Investor's suit—as in *Bowen*

---

[1] A few years before *Knudson*, the Court reiterated that, "[a]s *Bowen* recognized, the crucial question under § 702 is not whether a particular claim for relief is 'equitable' (a term found nowhere in § 702), but rather what Congress meant by 'other than money damages' (the precise terms of § 702)." *Dep't of Army*, 525 U.S. at 261. This clarification that *Bowen* did not turn on whether a requested remedy was equitable casts further doubt on the relevance of *Knudson*'s discussion of equitable remedies under ERISA for determining whether the APA's waiver of sovereign immunity applies.

but not *Knudson*—involves the APA, seeks enforcement of a statutory provision instead of a contract, and turns on the definition of "money damages," it is clear which precedent controls here.

The government also contends, in its reply brief, that the Supreme Court's decision in *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020), supports its reading that the relevant portion of "*Bowen* no longer is good law, as *Knudson* has overtaken it." ECF 124 at 7–8. Although the Court did distinguish *Bowen* when holding in *Maine Community* that the plaintiffs could bring their suits in the Court of Federal Claims, *see Me. Cmty.*, 140 S. Ct. at 1330–31, the government overreads the relevance of that discussion for this case. In particular, *Maine Community* noted that "[i]n *Bowen*, the State did not seek money damages, but instead sued for prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations under the Medicaid program." *Id.* at 1330. It is possible to read this statement, as the government does, as hinting that in *Bowen* the plaintiff's request for future relief—distinct from the challenge to reimbursement not paid out in the past—was important to the Court's holding. But doing so ignores *Bowen*'s central focus on the distinction between "seeking funds to which a statute allegedly entitles" the plaintiff versus "money in compensation for the losses . . . that [it] will suffer or has suffered by virtue of the withholding of those funds," and is difficult to reconcile with *Bowen*'s holding that "*the monetary aspects of the relief* that the [plaintiff] sought are not 'money damages' as that term is used in the law."[2]  487 U.S. at 893–96 (emphasis added) (citation and internal quotation marks omitted). And, even under this framing, Concert Investor does seek

---

[2] Additionally, nothing in *Maine Community* displaces the Court of Appeals's earlier application of *Bowen* to conclude that "[w]here a plaintiff seeks an award of funds to which it claims entitlement under a statute, the plaintiff seeks specific relief, not damages." *Am.'s Cmty. Bankers*, 200 F.3d at 829.

*some* forward-looking relief through an order that would both vacate the SBA's denial of its application and provide instructions on remand.  *See* ECF 109-2 at 12.

Crucially, Concert Investor seeks, among other things, an order that "[d]eclare[s] unlawful and set[s] aside [the SBA's] denial of Concert Investor's SVOG award request" and that "[p]reliminarily and permanently order[s] [the SBA] to consider Concert Investor's application for a SVOG award consistent with applicable law and the evidence before the SBA."  *Id.*  These requested remedies do not seek "money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, [they] seek[] to enforce the statutory mandate itself, which happens to be one for the payment of money."  *Bowen*, 487 U.S. at 900. That an order requiring SBA to reevaluate Concert Investor's application under the proper interpretation of the statute may ultimately "require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Id.* at 893.  "Indeed, the monetary aspect of any relief [Concert Investor] might be entitled to is much more a matter of guesswork than [in] *Bowen*" because here "a reversal would merely invalidate the reasons proffered for the [denial of the application] and would require no more than reexamination of the administrative decision on the merits."  *Esch*, 876 F.2d at 984.

2.    The government also argues that the Court lacks jurisdiction because the Tucker Act vests the Court of Federal Claims with exclusive "jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  In particular, the government contends that the Tucker Act applies here because courts have treated grants comparable to SVOG awards as contracts when determining whether the Court of Federal Claims has jurisdiction.  ECF 116-1 at 5–14.  The

government fails, however, to establish that Concert Investor's SVOG application constitutes a contract for purposes of the Tucker Act.

In *Megapulse, Inc. v. Lewis*, the Court of Appeals explained that "[t]he classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." 672 F.2d 959, 968 (D.C. Cir. 1982). Under that two-part test, Concert Investor's suit is "not 'at its essence' a contract action." *Id.* First, "the source of the rights upon which [Concert Investor] bases its claims" is not a contract—nor could it be, given that this entire dispute arises from the government's repeated denials of Concert Investor's application.[3] *Id.* Concert Investor, to the contrary, only raises claims that the SBA violated the APA. *See* ECF 109-2 at 10–11. Where, as here, "government defendants are charged with having acted beyond the scope of their statutory authority," "court rulings have made clear that the jurisdictional bar of sovereign immunity in property disputes arising from contractual relationships does not necessarily apply." *Megapulse*, 672 F.2d at 969. Second, "the type of relief sought (or appropriate)" here is not contractual. *Id.* For all the reasons discussed above, Concert Investor does not seek money

---

[3] The government suggests that the Tucker Act also grants exclusive jurisdiction to the Court of Federal Claims over claims arising from "an agency's failure to award a plaintiff a contract in the first place." ECF 116-1 at 6–7. This argument, however, is unpersuasive with respect to the SVOG program. The cases the government relies on for this contention concern bidding for government contracts. *See Res. Conservation Grp., LLC v. United States*, 597 F.3d 1238, 1242 (Fed. Cir. 2010); *Cent. Ark. Maint., Inc. v. United States*, 68 F.3d 1338, 1341 (Fed. Cir. 1995); *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1367 (Fed. Cir. 1983) (en banc); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed. Cir. 1998). Yet applications for SVOG awards are materially different than bids for government contracts, as the government is not hiring applicants to provide a particular service at a negotiated cost. Moreover, that the SVOG program does not involve contracts—at least during the application stage—is hardly surprising or unusual given that "[t]he government may implement statutorily mandated subsidy programs without employing contracts as a vehicle for doing so." *Boaz Hous. Auth. v. United States*, 994 F.3d 1359, 1368 (Fed. Cir. 2021).

damages or any other kind of contractual remedy that would implicate the Tucker Act. *See Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1108 (D.C. Cir. 2022) ("Exclusive jurisdiction in Claims Court under the Tucker Act does not lie merely because a plaintiff hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant." (alteration adopted) (citation and internal quotation marks omitted)).  It instead seeks "equitable relief, rather than damages for breach of contract," and that "type of relief requested . . . reveal[s] that this is not 'at its essence' a contract action." *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 4 (D.C. Cir. 1998).

Indeed, the Court of Federal Claims itself has rejected arguments that SVOG awards are contractual in nature.  In *Imaginarium, LLC v. United States*, for example, that Court observed that the authorizing statute for the SVOG program "merely requires the SBA to administer a grant program based on congressionally-defined criteria," which led it to conclude that "[t]he SVOG Program is clearly [a] program that does not employ contracts."  166 Fed. Cl. 234, 243, 245 (2023). The Court of Federal Claims thus held that a contract did not exist where the SBA sent a Notice of Award to an applicant but then subsequently denied the application due to a failure to meet eligibility requirements.[4]  *Id.* at 239–45.  And the Court also held in *Harlem Globetrotters International, Inc. v. United States* that a contract did not exist where the SBA sent the applicant a Notice of Award with an approved amount but then subsequently informed the applicant that it would not disburse any money due to a rescission of SVOG funds.[5]  168 Fed. Cl. 31, 35–36, 39

---

[4] The Court emphasized that "[t]he Notice of Award is more akin to a regulatory approval document than a manifestation of assent to a binding contract." *Imaginarium*, 166 Fed. Cl. at 244.

[5] That the Court of Federal Claims has heard two suits challenging the SBA's implementation of the SVOG program does not suggest that Concert Investor's suit also belongs in that Court.  In both cases, the plaintiffs were "not pursuing an APA case at all" because their "only claim for entitlement to money damages stems from the alleged breach[es] of contract." *Harlem*

(2023).   If initially-approved-but-later-denied SVOG awards do not constitute contracts, it is difficult to see how Concert Investor's having submitted an application that was never approved could somehow establish a contract.  Most obviously, there is no evidence of "mutuality of intent to contract" where the SBA denied Concert Investor's application.  *Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1380 (Fed. Cir. 2019).

Recent stay decisions from the Supreme Court about the proper forum in which to challenge grant cancellations do not change the calculus.  To be sure, in *Department of Education v. California*, the Court held that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case.  145 S. Ct. 966, 968 (2025) (quoting *Knudson*, 534 U.S. at 212).  But the Court simultaneously reaffirmed *Bowen* by reiterating that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds."  *Id.* (quoting *Bowen*, 487 U.S. at 910).  Given that *California* involved grants that were already in effect and could therefore be enforced as contractual agreements— which is not the case here—the government's cancellation of them implicated the Tucker Act.

The Court's similar decision in *NIH v. American Public Health Ass'n* to stay judgments vacating the government's termination of research grants also does not alter the jurisdictional outcome.  145 S. Ct. 2658, 2660 (2025).  Indeed, in that case, several Justices wrote separately to explain that *California* turned on the fact that the termination of grants created contractual claims. *See, e.g.*, *id.* at 2663 (Gorsuch, J., concurring in part and dissenting in part) ("*California* explained that suits based on any express or implied contract with the United States do not belong in district

---

*Globetrotters*, 168 Fed. Cl. at 42 (citation and internal quotation marks omitted); *see also Imaginarium*, 166 Fed. Cl. at 245 & n.5.

11

court under the Administrative Procedure Act (APA), but in the Court of Federal Claims under the Tucker Act." (citation and internal quotation marks omitted)); *id.* at 2665 (Kavanaugh, J., concurring in part and dissenting in part) ("The core of plaintiffs' suit alleges that the Government unlawfully terminated their grants.  That is a breach of contract claim.").

### III.    Merits

Turning to the merits, this case turns on the definition of "produces" as that word is used in the SVOG statute.[6]  15 U.S.C. § 9009a(a)(3)(A)(i)(I).  To reiterate, an entity can be "eligible" for the SVOG program if it is a "live venue operator or promoter, theatrical producer, or live performing arts organization operator, a relevant museum operator, a motion picture theatre operator, or a talent representative that meets" several enumerated requirements.  *Id.* § 9009a(a)(1)(A).  The statute defines "live venue operator or promoter, theatrical producer, or live performing arts organization operator" as an entity that, "as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events by performing artists."  *Id.* § 9009a(a)(3)(A)(i)(I).  The SBA denied Concert Investor's application on the ground that it did not qualify as a "live performing arts organization operator" because it did not "produce[]"concerts.  *Id.*

After consulting dictionary definitions and industry usage, the SBA determined that "to 'produce' a live event, an entity must demonstrate primary responsibility for the creative, financial

---

[6] Concert Investor contends in passing that it also "manages" concerts.  *See* ECF 94 at 30; ECF 114 at 17–18.  But in its administrative appeal, Concert Investor contended that it satisfied "live performing arts organization operator eligibility" only because its "principal business activity" was "to create and produce live events by performing artists."  AR660.  Given that Concert Investor did not previously raise this basis for eligibility before the SBA, the Court does not consider it now.  *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) ("It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.").

and managerial work required throughout all stages of the live event." AR1120–21. The SBA further elaborated that "[t]his definition does not mean that an entity must be the ultimate decision-maker," "[n]or does this definition mean that an entity must control all aspects of a show." AR1121. And it explained that "this definition does not mean that only one entity can be said to produce a show" because "[a] show can have multiple producers if their relationship with each other is akin to a partnership, rather than one dominant over the other." *Id.* Applying this definition, the SBA determined that Concert Investor "has not demonstrated it has the primary responsibility for the creative, financial, and managerial aspects of the events on which it works required to be considered to 'produce' the events on which it works." *Id.* The SBA instead concluded that, "[b]ased on the materials submitted," it "would consider Twenty-One Pilots to be the 'producer' of the concerts at issue in this matter." AR1124.

The SBA's definition departs from the Court of Appeals decision in this case and is inconsistent with the statutory text. To start, nothing in the Court of Appeals decision supports the SBA's requirement of "*primary*" control over the "creative, financial *and* managerial work." AR1121 (emphases added). To the contrary, the Court cautioned against a definition of "produces" that involves such a high degree of control as to "require organizing, promoting, managing, or hosting a concert." *Concert Inv.*, 100 F.4th at 221. The SBA's definition ignores this directive because an entity that has "the primary responsibility for the . . . managerial aspects of the" concert—as needed for the entity to "produce" a concert—would seem to always "manage" the concert as well. AR1121. But such overlap, the Court of Appeals concluded, "would render certain statutory terms 'altogether redundant.'" *Concert Inv.*, 100 F.4th at 221–22 (quoting *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018)); *see also id.* at 222 ("If an entity also had to organize, promote, manage, or host a concert in order to produce it, then any entity that met

13

the definition of 'produces' would simultaneously meet another basis for eligibility—rendering 'produces' superfluous.").

The government argues that its definition does not render "produces" superfluous given that "[a]n entity that 'produces' events may not qualify on the basis that it 'manages' them because managing alone is not 'a principal business activity' of the entity." ECF 112-1 at 10. But if "an entity must demonstrate primary responsibility for the creative, financial and managerial work required throughout all stages of the live event" "to 'produce' a live event," AR1121, every entity that produces as a principal business activity would seemingly also manage as a principal business activity. In its reply brief, the government pivots to contend that the SBA's "primary responsibility" standard does not require that "an entity must play a primary creative role, a primary financial role, *and* a primary managerial role." ECF 117 at 4. This late disjunctive reframing, however, contradicts every other indication of how the SBA intended for this standard to operate. The SBA's denial of Concert Investor's application seemed to treat having the primary responsibility for all three categories as necessary.[7] *See* AR1122–23 (separately finding that Concert Investor did not have "primary creative responsibility for the concerts on which it works,"

---

[7] The government cites the denial's statement that "[s]o long as an entity plays the primary creative, financial, and managerial role *overall*, it may produce a show even if there are aspects of the show that it does not control," AR1121 (emphasis added), as evidence that the SBA's definition never required an applicant to establish that it has the primary creative role, primary financial role, and primary managerial role, ECF 117 at 4. But nothing in the five other times that the SBA discussed the requirement to show "primary responsibility for the creative, financial, and managerial work" suggested that it was evaluating the degree of the role with these three requirements holistically rather than separately. *See* AR1121; AR1123. Indeed, the agency separated the analysis of whether Concert Investor had a primary creative role, primary financial role, and primary managerial role. *See* AR1121–23. Furthermore, the SBA's use of "overall" in this statement appears to be emphasizing that what matters is whether an entity has control over the "overall" show rather than establishing a test that an entity must have control over every "aspect[] of the show." AR1121. Such a consideration is therefore distinct from whether the entity had primary responsibility over the creative, financial, and managerial work separately or collectively.

14

"primary responsibility" "[w]ith regard to financial aspects of the live concerts," and "primary management authority" and not conducting any holistic inquiry into Concert Investor's overall level of responsibility).  The government's opening brief responded to Concert Investor's accusation that its interpretation would lead to the result that "an event would have no producer if one entity has primary responsibility for the financial and managerial work, but the artist itself wants primary responsibility over the creative aspects of its own show" by contending that an event not having a producer would not run afoul of the Court of Appeals decision—not by arguing that Concert Investor misunderstood the applicable test.  ECF 112-1 at 10 (citation and internal quotation marks omitted).  And even the government's reply brief continues to analyze whether Concert Investor has primary creative, financial, and managerial responsibility on a role-by-role basis.  *See* ECF 117 at 8–14 (arguing separately that Concert Investor "does not have primary creative responsibility," "does not have primary financial responsibility," and "does not have primary managerial responsibility").  Given this inconsistency and "because this argument first appears in [the government's] reply brief, it comes too late" and is unconvincing.  *TC Ravenswood, LLC v. FERC*, 741 F.3d 112, 117 (D.C. Cir. 2013).

The SBA's definition also sets too high a bar as a general matter even if it does not separately require majority-level control of the creative, financial, and managerial work.  After all, the Court of Appeals used "significant" instead of "primary" on multiple occasions when describing the degree of "financial, creative, and managerial" responsibility that producers must have.  *See Concert Inv.*, 100 F.4th at 222.  Although the SBA was not required to adhere to the exact language used in the Court's opinion as if it were a statute, it has failed to justify the higher bar it subsequently applied.

15

The Court of Appeals explained that "[w]here Congress uses a term that has an 'established meaning within a particular industry,' the term should be construed with 'reference to the actual context of the regulated industry in question.'" *Id.* (quoting *Ass'n of Am. R.R. v. Costle*, 562 F.2d 1310, 1319-21 (D.C. Cir. 1977)). Employing this approach, the Court emphasized that "a source that both parties identify as authoritative defines live event producers by the significant financial, creative, and managerial role that they play throughout the life cycle of an event." *Id.* And it then cautioned against reading this industry-based definition too strictly. *See id.* (noting that "the industry definition of producer is not limited to those with control over all aspects of a concert" and that "a producer may sometimes also be the concert's 'promoter,' 'live experience designer,' and 'music director,' while other times those roles may be performed by different parties" (citation omitted)).

The SBA's "primary responsibility" definition, however, goes beyond the Court of Appeals decision without sufficient industry support. The government argues that the Berklee College of Music's statement that "[m]any different people work together to make live events happen, but none have a greater impact on the outcome than concert and event producers," AR1071, supports its definition because "[i]f the producer has a greater impact on an event than anyone else who is involved with it, that means the producer is primarily responsible for the event," ECF 112-1 at 6. But that statement does not establish that an entity "produces" *only* if it has "primary responsibility for the creative, financial and managerial work required throughout all stages of the live event." AR1121. Whereas Berklee College's definition could be read to require an entity to have something like a plurality of the impact on a concert, the SBA's definition demands that an entity have a majority of the responsibility for the creative, financial, and managerial work. A mismatch therefore exists because an entity can have "a greater impact on the outcome" of the concert than

16

anyone else, AR1071, without having "primary responsibility for the creative, financial and managerial work required throughout all stages of the live event," AR1121.

The rest of the Berklee College discussion of "concert/event producer[s]" also counsels against the SBA's strict definition. The College explicitly notes that "in an industry notorious for flexible job descriptions, concert and event producers are among the most difficult to pin down." AR1072. And it explains that the role of a producer can vary because "every event requires a different approach." *Id.* The SBA's requirement that an entity have "primary responsibility for the creative, financial and managerial work required throughout all stages of the live event," AR1121, therefore departs from the industry usage that the Court of Appeals endorsed,[8] *Concert Inv.*, 100 F.4th at 222.

The SBA's definition also led it to conclude that "Twenty-One Pilots [was] the 'producer' of the concerts at issue in this manner and . . . could be eligible as a Live Performing Arts Organization Operator if it applied." AR1124. But the statute contemplates that an entity that produces is distinct from the performing artist. The statute focuses on whether "an individual or entity . . . as a principal business activity, organizes, promotes, produces, manages, or hosts live concerts, comedy shows, theatrical productions, or other events *by performing artists*." 15 U.S.C. § 9009a(a)(3)(A)(i)(I) (emphasis added). This juxtaposition between "an individual or entity" that

---

[8] The government's reliance on non-concert-specific definitions of "produces" to defend the "primary responsibility" standard is unconvincing. *See* ECF 112-1 at 6–7. How the film and television industries use "produces" cannot trump the concert industry's usage of that term given that the relevant statutory definition of "live venue operator or promoter, theatrical producer, or live performing arts organization operator" concerns an entity "that, as a principal business activity, organizes, promotes, produces, manages, or hosts *live* concerts, comedy shows, theatrical productions, or other events by performing artists." 15 U.S.C. § 9009a(a)(3)(A)(i)(I) (emphasis added); *see also* ECF 117 at 6 (conceding that "movies and television are not live" for these purposes).

is the "live venue operator or promoter, theatrical producer, or live performing arts organization operator" overseeing the events in some capacity, on the one hand, and the "performing artists" who are the talent at the events, on the other hand, suggests that the SBA's interpretation of the relevant statutory language is erroneous. *Id.* And another definitional provision in the statute also differentiates between a "live venue operator or promoter, theatrical producer, or live performing arts organization operator" and "artists and entertainers."[9] *Id.* § 9009a(a)(1)(A)(iii).

For all these reasons, the SBA's denial of Concert Investor's application is "not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Int'l Dark-Sky Ass'n, Inc. v. FCC*, 106 F.4th 1206, 1220 (D.C. Cir. 2024) ("An agency action based on a flawed interpretation of a statute or regulation is contrary to law."). Its definition of "produces" fails to "capture the significant financial, creative, and managerial role that live event producers play from start to finish" without rendering the surrounding statutory text superfluous or contradictory. *Concert Inv.*, 100 F.4th at 222.

## IV.    Remedy

"Remand with vacatur is the ordinary remedy for unlawful agency action." *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1186 (D.C. Cir. 2025). Concert Investor, however, contends that "remand would be futile[,] . . . as only one disposition is possible as a matter of law." *George Hyman Const. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992); ECF 94 at 31–33;

---

[9] That the Berklee College of Music discussion of what it means to be a "concert/event producer" states that "many professional musicians and bands find success producing their own shows" does not save the SBA's interpretation. AR1072. Even if "performing artists" sometime meet the industry definition for producers, nothing prevented Congress from excluding them from this provision of the SVOG program for "live performing arts organization operator[s]." 15 U.S.C. § 9009a(a)(3)(A)(i)(I). The SBA's conclusion that "Twenty-One Pilots could be eligible as a Live Performing Arts Organization Operator if it applied and otherwise met the eligibility requirements of the SVOG statute" still illustrates its misinterpretation of key statutory terms. AR1124.

ECF 114 at 19–23.  The government responds that "[r]emand would serve a purpose here because even if the 'primary responsibility' test is erroneous, [the] SBA would still need to address various issues to determine whether Concert Investor is both eligible for and entitled to a grant."  ECF 112-1 at 32–45.

Vacatur and remand is the proper remedy here.  "Only in rare cases, when the reviewing court is convinced that remand would serve no purpose, does the court direct the agency how to resolve a problem."  *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1111 n.6 (D.C. Cir. 2014). This case is not one of those "rare cases" because the SBA must make several additional determinations before it reaches a final decision on Concert Investor's SVOG application.  *Id.* Before approval could happen, the SBA would have to apply the proper standard to Concert Investor's application and ensure that Concert Investor meets the other eligibility criteria.  It might also have to decide whether it wished to exercise its potential statutory discretion to award the SVOG grant.  *See* 15 U.S.C. § 9009a(b)(2)(A).  Given that the outcome of these additional steps is not preordained,[10] it cannot be said that "remand would serve no purpose."[11]  *Allina Health*, 746 F.3d at 1111 n.6.

---

[10] Concert Investor argues that the Court can decide now that Concert Investor "produces" concerts for purposes of the SVOG statute because "[t]he government concedes that Concert Investor has 'significant' 'creative, financial, and managerial responsibility' for live concerts."  ECF 114 at 5 (citation omitted).  But the government makes no such concession.  Rather, it states that (1) "Concert Investor's submissions to SBA demonstrate that it has significant but not primary responsibility for the visual elements of concerts, and that it has virtually no responsibility for other creative elements of concerts such as music and other audio"; (2) "Concert Investor had some financial responsibility for the concerts"; and (3) "Concert Investor submitted no evidence that it has significant (let alone primary) responsibility for managing anything but the shows' visual elements."  ECF 112-1 at 19–22.  It may very well be that these responsibilities, when considered holistically, are sufficient, but remand remains proper on this issue so that the SBA can evaluate in the first instance whether Concert Investor meets the proper definition of "produces."

[11] For similar reasons, the Court declines Concert Investor's request to "order the SBA to immediately obligate funds in the amount of the grant as well as the supplemental grant which, by

## V.    Conclusion

The Court denies the government's motion to dismiss, ECF 116; grants in part and denies in part Concert Investor's motion for summary judgment, ECF 94; and denies the government's motion for summary judgment, ECF 112.  The Court also denies the government's earlier motion for summary judgment, ECF 104, and Concert Investor's motion for oral argument, ECF 129, as moot.  Accordingly, the Court vacates the SBA's denial of Concert Investor's SVOG application and remands this case for further proceedings consistent with this opinion.

DATE:  March 13, 2026

CARL J. NICHOLS
United States District Judge

---

operation of the statute, Concert Investor also should receive."  ECF 94 at 32–33.  There is not "documentary evidence of . . . a grant or subsidy payable . . . from appropriations made for payment of, or contributions to, amounts *required to be paid* in specific amounts fixed by law or under formulas prescribed by law" given that the SBA has not yet approved an SVOG award for Concert Investor and the Court is not ordering it to do so at this stage.  31 U.S.C. § 1501(a)(5)(A) (emphasis added).